# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

BARBARA BRUNI,                  :
                                :
          Plaintiff,            :
                                :
     v.                         :          Civ. No. 09-743-LPS
                                :
MICHAEL J. ASTRUE,              :
Commissioner of Social Security, :
                                :
          Defendant.            :
                                :

Gary C. Linarducci, Esquire, and Steven L. Butler, Esquire, of LINARDUCCI & BUTLER, New Castle, Delaware.

Attorneys for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney, and Patricia A. Stewart, Esquire, Special Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.
Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel and Jordana Cooper, Esquire, Assistant Regional Counsel, of the SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania.

Attorneys for Defendant.

## MEMORANDUM OPINION

March 29, 2011
Wilmington, Delaware

_Stark, District Judge:_

## I. INTRODUCTION

Plaintiff Barbara Bruni ("Bruni" or "Plaintiff") appeals from a decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner" of "Defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Bruni and the Commissioner. (D.I. 8, 10) Bruni asks this Court to reverse and remand Defendant's decision. (D.I. 8) Defendant requests that the Court affirm his decision. (D.I. 10) For the reasons set forth below, the Court will (1) deny Plaintiff's motion for summary judgment and (2) grant Defendant's motion for summary judgment.

## II. BACKGROUND

### A. Procedural History

Bruni filed her claim for supplemental social security income and DIB in April of 2007. Bruni alleges disability beginning March 1, 2006. The application was denied on November 5, 2007, and was again denied on reconsideration on February 21, 2008. Bruni filed a request for a hearing on March 14, 2008. On December 9, 2008, a hearing was held before Administrative Law Judge (ALJ) Showalter. ALJ Showalter issued a decision affirming the denial on April 29, 2009. Plaintiff filed a request for review by the Appeals Council on June 26, 2009, which was denied on August 14, 2009. (D.I. 5 ("Tr.") at 1, 5)

On October 6, 2009, Bruni filed a Complaint seeking judicial review of the ALJ's April 29, 2009 decision. (D.I. 1) Plaintiff moved for summary judgment on February 24, 2010. (D.I.

1

8) The Commissioner filed a cross-motion for summary judgment on March 26, 2010. (D.I. 10) On August 17, 2010, this case was re-assigned to the undersigned United States District Judge.

## B. Factual Background

### 1. Plaintiff's Medical History, Treatment, and Condition

Bruni was forty-nine (49) years old when she applied for DIB and supplemental social security income on April 2, 2007. (Tr. 105) Bruni is a high-school graduate and previously worked as a circulation manager, cashier, salesperson, deli clerk, laborer, and driver of school buses, trucks, and tractors. (Tr. 31-36, 53-54, 154, 164, 169)

Bruni alleges she became disabled on or about March 1, 2006. (Tr. 105, 162-63) Throughout the benefit application process, Bruni asserted disability on account of Crohn's disease, depression, sleep disturbances, allergies, Chronic Obstructive Pulmonary Disease (COPD),[1] and back pain.

Bruni was treated for her various medical conditions by the following physicians: Dr. Magat, M.D., and Dr. Manalo, M.D., who are primary care physicians (Tr. 224-28, 276-85); Dr. Butt, M.D., a specialist in gastroenterology, who treated Bruni's Crohn's disease (Tr. 207); Dr. Aaron, M.D., who analyzed Bruni's sleep disturbances (Tr. 271-72); and Dr. Pierre Leroy, a back specialist, who treated Bruni for her back pain in 1994 (Tr. 166). Other physicians' interactions with Bruni and/or review of her medical history are also part of the record before the Court. The non-treating physicians are: Dr. Lifrak, M.D., who performed Bruni's consultative examination on behalf of the Commissioner in October 2007 (Tr. 231-37); Dr. Goldsmith, M.D., who

---

[1]Chronic Obstructive Pulmonary Disease (COPD) is a disease which makes breathing difficult. A patient suffering from COPD generally suffers symptoms similar to asthma.

analyzed Dr. Lifrak's conclusions regarding Bruni's consultative examination on behalf of the Commissioner (Tr. 242); and Dr. Brandon, Ph.D., and Dr. Flock, Psy. D, who are state agency psychologists who each performed psychological evaluations of Bruni as part of her examination for the Social Security Administration. The Court describes the record with respect to each of Bruni's conditions below.

<h2 style="text-align:center">a.     Crohn's Disease</h2>

Crohn's disease is caused by inflammation of the digestive lining and results in symptoms of severe diarrhea and abdominal pain. (Tr. 210) In 1998, Bruni began experiencing bloody diarrhea. (Tr. 210) According to Plaintiff, this required her to be "by the bathroom all the time." (Tr. 163)

Beginning in March 2006, Dr. Butt, a gastroenterology specialist, began to treat Bruni for Crohn's disease.[2] Dr. Butt noted that Bruni received prior treatment from other doctors for her Crohn's disease, but was released from their practices for non-compliance. (Tr. 207) Dr. Butt further noted he saw Bruni for "one appointment, six years ago." (Tr. 207) He indicated that Bruni had been "non-compliant with follow up" and she risked being similarly released from his practice. He indicated more testing and analysis was necessary to determine whether the Crohn's disease was clinically active, and whether it caused her diarrhea. (Tr. 207) Dr. Butt speculated about the proper treatment if the Crohn's disease remained active, but he did not opine whether Bruni's Crohn's disease remained active. (Tr. 207)

In April 2007, Bruni's primary care physician, Dr. Manolo, listed "Crohn's Disease" on

---

[2]Dr. Butt's analysis is contained in a letter to Dr. Uzoma Kalu, M.D. Dr. Kalu had referred Bruni to Dr. Butt's office. (Tr. 207)

Bruni's "Patient Macro." However, Dr. Manolo did not offer any medical analysis related to that condition. (Tr. 225)[3] In May 2007, Bruni underwent a colonoscopy to examine the status of her Crohn's disease. (Tr. 217-22) The colonoscopy report indicated that Bruni's colon demonstrated evidence of "burned out" disease, which Dr. Butt described as "quiescent." (Tr. 219)

On October 22, 2007, Dr. Irwin Lifrak, M.D., examined Bruni as part of her disability eligibility determination. (Tr. 233) During this visit, Bruni complained of abdominal discomfort. (Tr. 233) Dr. Lifrak's diagnostic impression included gastritis and "possible colitis," which would account for her discomfort. (Tr. 233, 236)

In January 2008, Bruni returned to Dr. Butt's office and Dr. Butt interpreted the colonoscopy report. (Tr. 275) Dr. Butt noted the colonoscopy report displayed virtually no disease activity; he described her Crohn's disease as "clinically inactive." (Tr. 275) Dr. Butt ordered that Bruni undergo a follow-up colonoscopy in one year and granted Bruni's wish that no medication be prescribed for treatment of her Crohn's disease. (Tr. 275)[4]

In February 2008, Dr. Magat included Crohn's disease on disability forms filed with the Delaware Department of Health and Social Services. (Tr. 268, 269)[5]

---

[3]The "patient macro" refers to specific terminology used on Dr. Manolo's records for Bruni. The "patient macro" section includes the patient's height, birth date, and previously diagnosed conditions. On the specific record cited, the listed conditions are Crohn's disease, depression, and COPD. Plaintiff argues that Dr. Manolo's inclusion of these conditions represents Dr. Manolo's then-present diagnostic impression. However, Dr. Manolo's records also contain an "Assessment" section and the conditions listed there appear to show no relation to those listed in the "patient macro" section.

[4]The record shows that despite not taking the prescribed medication for approximately one year prior to that visit, there was no advancement of Bruni's Crohn's disease. (Tr. 275)

[5]The parties disagree regarding the proper interpretation of Dr. Butt's analysis after reading the colonoscopy report, as well as the significance of Dr. Magat including Crohn's

### b. Depression

Bruni began suffering from depression around the same time she first experienced symptoms of Crohn's disease. (Tr. 167, 233-34) She has been hospitalized on more than one occasion for suicide attempts. (Tr. 42, 167, 233-34) In December 2006, Dr. Magat treated Bruni for depression. (Tr. 227)[6] In April 2007, Dr. Manolo included "depression" among the conditions listed on Bruni's "patient macro." However, Dr. Manolo performed no analysis of her depression at that time. (Tr. 225) Dr. Lifrak's diagnostic impression in October 2007 included depression. (Tr. 236) Dr. Manolo confirmed his diagnosis of depression in January 2008, and prescribed Xanax and Paxil for treatment of Bruni's depression and other anxiety symptoms. (Tr. 284)

### c. Sleep Disturbances

In 2004, Bruni's sleeping difficulties were evaluated by Dr. Aaron. (Tr. 271-72) Bruni complained that her sleeping difficulties hindered her energy levels and ability to concentrate. (Tr. 272) Dr. Aaron's impression after this visit was that Bruni may suffer from bouts of sleep apnea, insomnia, restless leg syndrome, sleep talking, nightmares, and night terrors. (Tr. 271-72) Dr. Aaron recommended that Bruni undergo an overnight sleep study to confirm his suspicions and to determine the significance of her sleep apnea. (Tr. 272) Dr. Manolo diagnosed Bruni with insomnia in April 2007 and later confirmed his assessment. (Tr. 225, 284)[7] In October

---

disease on Delaware social service disability forms.

[6]Dr. Magat is a medical doctor and does not have a background in psychology.

[7]Plaintiff's brief argues Dr. Manolo's assessment occurred in January 2008, but no date is included on the report. Because of the nature of the report, it is apparent that it was a re-assessment of the previous diagnosis.

5

2008, Dr. Magat ordered an overnight sleep study for Bruni. (Tr. 274, 276) Bruni was scheduled to undergo a sleep study on October 30, 2008. (Tr. 274)

### d. Allergic rhinitis

Dr. Manolo diagnosed Bruni with allergic rhinitis in April 2007, after Bruni explained she felt weak and was coughing, sneezing, and producing excessive phlegm. (Tr. 225) To counter the allergies, Dr. Manolo prescribed Nasonex. (Tr. 225)

### e. COPD

In December 2006, Dr. Magat treated Bruni for COPD. (Tr. 227)[8] Dr. Lifrak's October 2007 diagnostic impression included possible COPD. As a result, Dr. Lifrak cleared Bruni for pulmonary function testing. (Tr. 236)[9] In February 2008, Dr. Magat prescribed Prednisone and Avelox for Bruni's COPD and advised her to quit smoking. (Tr. 281-82)

### f. Disk damage/joint disease/osteoarthritis

In October 2007, during her visit with Dr. Lifrak, Plaintiff complained of back pain that had begun bothering her as early as 1989. (Tr. 233-34) Dr. Lifrak's diagnostic impression included range of motion defects consistent with disk damage. (Tr. 236) From the same October 2007 visit, Dr. Lifrak's diagnostic impression also included possible degenerative joint disease. (Tr. 236) Dr. Lifrak determined Bruni could stand for up to five (5) hours per day, lift up to ten (10) pounds on a regular basis, and walk without restriction. (Tr. 237)

Dr. Goldsmith performed an analysis of Dr. Lifrak's diagnostic impression and recorded

---

[8]The terms COPD and asthma are used interchangeably by Plaintiff to describe her COPD.

[9]It is unclear whether Bruni ever completed this testing.

6

her diagnosis regarding Bruni's physical residual functional capacity. (Tr. 238-42) Dr. Goldsmith concluded that Plaintiff could stand for six (6) hours in a standard work day, lift up to twenty (20) pounds, and walk and stand for about six (6) hours per day. (Tr. 239)

In 1994, Bruni received treatment from Dr. Pierre Leroy for a herniated disk. (Tr. 166) Since that visit, Bruni has not seen other specialists for her back injuries. (Tr. 166) Bruni explained that her back pain was treated by her primary care physician. (Tr. 37) However, this treatment did not involve the prescription of pain medication. Rather, according to Bruni, her back pain was effectively self-treated with over-the-counter, patient-administered, anti-inflammatories. Dr. Manolo diagnosed Bruni with osteopenia in January 2008. (Tr. 284)[10]

### g.    Overall

As a result of his medical evaluations, Dr. Magat concluded that Bruni was unable to perform her usual occupation or other occupations because of her COPD, depression, Crohn's disease, asthma, and arthritis. (Tr. 268-70, 286) Dr. Magat opined that Bruni's conditions rendered her continuously disabled for at least eighteen months. (Tr. 268-70, 286)

### 2.    The Administrative Hearing

Bruni's administrative hearing took place on December 9, 2008. (Tr. 24) Bruni was not represented at the hearing. (Tr. 36) She had, however, been previously advised of her right to representation and had also been supplied with suggested free and private representation. (Tr. 84-90) At her hearing, Bruni was again reminded of her right to procure representation, but decided to represent herself. (Tr. 29)

---

[10]Osteopenia is a condition of decreased bone density.

### a. Plaintiff's Testimony

Bruni testified that she was 5 feet 5 inches tall and weighed 180 pounds. (Tr. 30) She was able to drive, read, write, and do simple addition and subtraction. (Tr. 31) From 1991 to 1993 she had worked as a cashier at a 7-Eleven. (Tr. 33) From 1994 to 1995, Bruni worked in a supermarket deli. (Tr. 33) Then, from 1995-1998, Bruni worked at the News Journal newspaper as a District Manager of Circulation. (Tr. 32) From there, from 1997 to 2002 and again in 2005 and 2006, Bruni worked as a school bus driver. (Tr. 31) According to her testimony, none of these jobs required heavy lifting. (Tr. 32-33)

Bruni further testified that she became disabled in March 2006, mostly due to her Crohn's disease. (Tr. 34) Since that date, Plaintiff worked as a liquor store cashier and assisted on the farm on which she lives. (Tr. 34)[11] The main factor preventing her return to work was the Crohn's disease. (Tr. 35) She explained, "I have diarrhea all the time . . . you know, I had a lot of accidents." (Tr. 35)

Bruni confirmed most of the facts in the record regarding her Crohn's disease and Dr. Butt's treatment of her. (Tr. 39) She testified that she chooses not to take the medicine Dr. Butt prescribes because "it just makes diarrhea worse." (Tr. 39) Her average day includes "a lot of gas and a lot of cramps, and diarrhea every day . . . three or four times." (Tr. 39)

Bruni also testified that she has herniated discs in her back resulting from falling off a swing in 1989. (Tr. 36) She added that she had not received any treatment from a back specialist since the early 1990s. (Tr. 37) Bruni stated that her doctor did not prescribe any medicine

---

[11]Plaintiff testified that wages she earned while helping out on the farm were credited against her rental expenses. She added that even when she was working on the farm, her Crohn's disease required her to make frequent impromptu bathroom breaks.

specifically for her back pain. (Tr. 37) When questioned why she did not request pain medicine from her doctor, Bruni explained the pain "doesn't stay long. I mean, it goes away. I take Tylenol, Advil, Aleve." (Tr. 38)

When prompted as to whether she wished to inform the ALJ about additional health problems, Bruni mentioned her asthma and allergies. (Tr. 40) Bruni explained she was prescribed inhalers of Combivent and Albuterol, in addition to taking Singulair. (Tr. 40) She explained that "when the weather changes my allergies are worse." (Tr. 41)

Bruni also testified that she takes Paxil for depression. (Tr. 42) When questioned whether her depression symptoms have improved with treatment, Bruni explained "it depends" and then elaborated, "Am I better? Yeah, I'd say yes. But I still have lapses of depressions, you know." (Tr. 43) Bruni testified that on an average day she feels sad. (Tr. 43) Bruni explained that she preferred to be away from people, but had not thought about harming herself for over a month. (Tr. 43)

Bruni also explained that she has a sleeping disorder and that she takes "Rozerem" but without success. (Tr. 44) A normal night consists of only three to four hours of sleep. (Tr. 44) Her asthma limited her to walking for less than one hour per day. (Tr. 47) Bruni added that her back pain made it difficult to stand and sit for more than one hour each day. (Tr. 47-8) She estimated that the heaviest she could lift was probably ten pounds. (Tr. 48)

**b.      Vocational Expert's Testimony**

An independent vocational expert also testified at the hearing. (Tr. 24-56) The vocational expert testified that Bruni's past job at the News Journal newspaper provided her with transferable skills for customer service and, potentially, basic accounting skills. (Tr. 54) In the

expert's opinion, an individual with Bruni's limitations would be able to return to work in Bruni's prior positions as a cashier or a deli clerk. (Tr. 53-55) However, the vocational expert further testified that if the ALJ were to accept Bruni's testimony in its entirety, the frequent bathroom breaks she requires as a result of Crohn's disease would preclude employment. (Tr. 56)

### 3. The ALJ's Findings

The ALJ concluded that Plaintiff's medical conditions were not disabling. Initially, the ALJ did not find Bruni disqualified from receiving benefits just on account of the work she had engaged in following her alleged disability onset date, since that limited work was not substantial gainful employment. (Tr. 12-13) The ALJ next found that although Plaintiff had three severe impairments – Crohn's disease, COPD, and obesity – none of them met the requirements of the Listings of Impairments in 20 C.F.R. § 404. (Tr. 13, 18)[12]

The ALJ concluded that each of Bruni's additional impairments were non-severe. (Tr. 14-18) In particular, the ALJ dismissed the osteoarthritis as non-severe because Bruni did not establish her herniated disc(s) through objective evidence. (Tr. 15) Furthermore, claimant's testimony that over-the-counter pain relievers negated the pain served to reinforce the lack of objective evidence. (Tr. 15) The ALJ found that Bruni's allergies were non-severe because they did not cause more than a minimal impact upon Bruni's ability to perform sustained work activities. (Tr. 15) Bruni's sleep disorder was found non-severe because Bruni did not participate in the prescribed sleep study. (Tr. 16) Without sleep study results, the ALJ found

---

[12]While obesity is a severe impairment, by itself it is insufficient for establishing disability. Instead, obesity is considered a factor which exacerbates other severe conditions that are present. SSR 02-1p, 2000 WL 628049. Bruni argues that the ALJ failed to consider the effect of Bruni's obesity upon her musculoskeletal impairments.

there was no objective means to establish her alleged sleep disorders. (Tr. 16)

The ALJ also determined that Bruni's anxiety and depression were non-severe. (Tr. 17) A mental impairment's severity is assessed based on four functional areas: activities of daily living, social functioning, concentration, and decompensation. (Tr. 16-17)[13] The ALJ determined that Bruni's mental impairments did not cause more than mild limitations in any of these four functional areas. (Tr. 17) The ALJ considered the psychological reviews of two different state agency medical consultants. (Tr. 17) The first, Dr. Flock, Psy. D, concluded on November 1, 2007 that Bruni failed to establish depression as an impairment because of insufficient evidence. (Tr. 17) Dr. Brandon, Ph.D., concluded on February 19, 2008, that Bruni was mildly limited in her activities of daily living, social functioning, concentration, persistence, and pace. (Tr. 17) However, Dr. Brandon found that Bruni demonstrated no episodes of decompensation. (Tr. 17) Primarily, the Court relied on Dr. Brandon's analysis in finding that Bruni's depression did not prevent her from working. (Tr. 18) The ALJ was also persuaded by Bruni's admission that Paxil was effective in treating her depression. (Tr. 18)[14]

Next the ALJ concluded that Plaintiff retained the residual functional capacity to perform unskilled light work. (Tr. 18-22) Then the ALJ concluded that Bruni was capable of performing jobs similar to her previous work as a cashier or deli clerk. (Tr. 23) Because of the foregoing findings, the ALJ held that Bruni was not disabled from March 1, 2006 through April 29, 2009. (Tr. 23)

---

[13]Decompensation is a loss of ability to maintain normal or appropriate psychological defenses. This loss can result in depression, anxiety, or delusions.

[14]Bruni made a statement to this effect in a phone conversation with an employee of the social security administration on February 19, 2008. (Tr. 18)

11

## III.  LEGAL STANDARDS

### A.  Motion For Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986).  A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted).  The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions,

conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### B.     Review Of The ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383 (c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the

13

evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95

(3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the

Appeals Council or the District Court as a basis for remanding the matter to the Commissioner

for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239

F.3d at 592. "Credibility determinations are the province of the ALJ and only should be

disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp.

2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the

substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence –

particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really

constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.

1983).

Thus, the inquiry is not whether the Court would have made the same determination but,

rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d

1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently,

it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by

substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a

14

physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the

Social Security Act provides for the payment of disability benefits to indigent persons under the

SSI program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of both DIB and SSI as

the inability to do any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C.

§§ 423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if his physical or mental

impairment or impairments are of such severity that he is not only unable to do his previous work

but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see*

*also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d

422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point

in the sequential process, the Commissioner will not review the claim further. 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any

substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), 416.920(a)(4) (mandating finding

of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not

engaged in substantial gainful activity, step two requires the Commissioner to determine whether

the claimant is suffering from a severe impairment or a combination of impairments that is

severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's

impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in

the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Bruni's Argument on Appeal

Bruni presents five arguments in her appeal. Bruni argues that: (1) the ALJ failed to fulfill her duty to develop the record adequately in light of Bruni's unrepresented status at the hearing; (2) the ALJ misapplied the agency's severity standard; (3) the ALJ failed to accord appropriate deference to the opinions of Bruni's treating physician; (4) the ALJ failed to explain her weighing of the consulting opinion; and (5) the vocational expert's testimony did not include all of Bruni's established limitations. The Court considers each of these arguments in turn.

### 1. Whether the ALJ failed to develop the record adequately given Plaintiff's unrepresented status at the hearing

Plaintiff first observes that it is the ALJ's responsibility to "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110 (2000). In making this argument, Plaintiff relies on the Third Circuit's decision in *Hummel v. Heckler*, 736 F.2d 91, 95 (3d Cir. 1984), which held that an "ALJ has the affirmative obligation to assist the claimant in developing the facts." Bruni also cites *Reefer v. Barnhart*, 326 F. 3d 376, 380 (3d Cir. 2003), in which the Third Circuit emphasized that the ALJ's duty to assist a claimant in developing the record is more profound when the claimant is unrepresented. She also draws the Court's attention to a Seventh Circuit decision, *Ransom v. Bowen*, 844 F. 2d 1326, 1330 n.4 (7th Cir. 1998), for the proposition that an unrepresented claimant who also suffers

17

from a mental impairment has an even greater entitlement to an ALJ's careful development of the record.

Applying these cases to her own circumstances, Bruni contends that due to her unrepresented status, combined with her history of depression and sleeping disorders, the ALJ owed her a heightened duty to develop the record. In Bruni's view, the ALJ failed to fulfill this duty. To Plaintiff, the record was underdeveloped due to the ALJ's unwillingness to assist her. Had the record been adequately developed, Plaintiff continues, there would have been adequate evidence of objective testing (e.g., relating to her sleep disorder and herniated discs).

Bruni further points to a subsequent favorable disposition, by which the Commissioner granted her disability benefits, and contends that this new evidence warrants remand under sentence six of 42 U.S.C. § 405(g). *See also Szubak v. Sec'y of Health and Human Services*, 745 F. 2d 831, 833 (3d Cir. 1984). More particularly, she contends that this subsequent favorable decision shows that a more fully developed record would have compelled the ALJ to have granted the earlier benefits application that is the subject of this appeal.

The Commissioner responds that whether information has been gathered at the hearing is unimportant as long as the ALJ secures the adequate records by the time she issues her opinion. Therefore, in the Commissioner's view, any statements made by the ALJ at the hearing are unhelpful in analyzing the thoroughness of the record. The Commissioner adds that, when the full context is understood, the ALJ fulfilled her duty to develop the record. More importantly, the Commissioner asserts that none of the "missing" documentation Plaintiff identifies would have altered the ALJ's decision. Finally, the Commissioner rejects Plaintiff's attempts to raise her subsequent successful disability benefits application as evidence that a thoroughly developed

18

record would have led to a different decision. To the Commissioner, not only is introduction of the subsequent evidence improper, but it is also not probative of whether the plaintiff was disabled for the period in question.[15]

Plaintiff places emphasis on an exchange that occurred between her and the ALJ at her administrative hearing. In Plaintiff's view, this exchange shows that the record was not properly and thoroughly developed. The pertinent portion of that exchange is reproduced below:

| | |
|---|---|
| ALJ: | Now we have exhibits 1A through 9F. When I looked at your file ahead of time I saw that your treatment notes stop in 06 and 07. Have you gone back to work? |
| Bruni: | No. |
| ALJ: | No. All Right. And are you still getting medical treatment? |
| Bruni: | Yes. |
| ALJ: | Okay, because our – now what you're going to have to do, Bruni, is you'll take the CD with you. |
| Bruni: | Uh-huh. |
| ALJ: | If you don't have a computer at home, you'll take it to the public library nearest you. The librarian will assist you. I don't know whether you can use a computer. Do you have one at home? |
| Bruni: | No I don't. |
| ALJ: | Librarian will assist you in putting the CD in, and |

---

[15]Once Bruni appealed the agency's finding that she was disabled, she immediately reapplied for disability benefits. Because the initial application was the subject of the instant appeal, disability benefits for the period from the alleged disability onset through the date of the ALJ's decision were reviewable only by the Court. As a result, Bruni's subsequent application resulted only in disability benefits accruing from the date of the ALJ's decision forward. *See* 2002 WL 1877920 (New Disability Applications).

you look at it. And then what you're going to have to do is figure out how you, what records you need to update. I have no idea what records you need, because only you know. But the bottom line is, is that your treatment notes stop in '06 and '07. And if you've gone back to work that's one thing. If you haven't then the records will have to be updated.

Bruni:     Okay.

ALJ:       So you'll have to figure out, by looking at the CD you can see what's there, and then you'll figure out what isn't there, and then get those records from your doctor. Now I can give you, well, we'll talk about this when the hearing's over. I can explain to you how you'll go about getting all of those exhibits.

(Tr. 4)

As this exchange indicates, at the time of the hearing the record was somewhat underdeveloped – as the ALJ observed. The ALJ is the one who raised the issue of the adequacy of the record. The ALJ provided Bruni some assistance in further developing the record, providing her the CD referenced in the above excerpt. The ALJ also sought to enlist Bruni's assistance in further developing the record, in suggesting she take the CD to a library, but also in questioning her (later in the hearing) to attempt to determine which medical professionals Bruni had seen since May 2007 (and which, therefore, would likely have additional medical records). (Tr. 36-38, 40-42, 51-52) Indeed, the record shows that at the December 2008 hearing, the ALJ questioned Bruni extensively on whether she wished to proceed unrepresented and, thereafter, pointed out to her that the medical records in the ALJ's possession ended in May 2007. (Tr. 27-29, 52) It is simply not the case, as Bruni insists, that the ALJ "offered Bruni no assistance in

20

remedying the situation." (D.I. 9 at 10)[16]

Furthermore, in later portions of the transcript (not quoted above), the ALJ accepted into the record supplementary medical records provided by Plaintiff. (Tr. 52) Most importantly, subsequent to the hearing, and prior to the ALJ's issuance of her opinion denying benefits, the ALJ further developed the record by receiving (if not soliciting)[17] additional medical records, including updated records (dated after May 2007 and up through October 2008) from Bruni's treating physicians, Drs. Magat and Manalo, and letters from specialists to whom these treating physicians had referred her. (Tr. 271-85) Additionally, the missing records on which Bruni focuses are those relating to her psychiatric hospitalizations in 2005 and 2006, and records related to her herniated disc(s). (D.I. 12 at 7) But the psychiatric records were unlikely to have altered the ALJ's conclusion, given Bruni's testimony at the hearing about her improved psychological condition. Similarly, the missing records regarding Bruni's herniated disc(s) related to a condition that had last been treated in 1994, and are, again, unlikely to have altered the ALJ's findings.

Bruni's successful subsequent application for disability benefits does not alter these conclusions. Generally, the Court's task is to review only the evidence submitted to the ALJ. *See*

---

[16]Plaintiff's argument based on the Seventh Circuit's decision in *Ransom* is also unavailing. Under *Ransom*, the severity of a claimant's mental illness impacts the height of the duty an ALJ owes a claimant. For instance, in *Ransom*, 844 F.2d at 1330, the claimant's paranoid schizophrenia necessitated the ALJ's higher duty to develop the record. Here, given the substantial evidence for the ALJ's finding that Bruni's depression, anxiety, and sleeping disorders are not severe impairments, the Court concludes that the ALJ satisfied her duty, even to the extent it was somewhat heightened due to Bruni's mental impairments.

[17]The record is not clear as to whether the ALJ reached out to Bruni's treating physicians for the additional medical records or how they came to be in the ALJ's possession.

*Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). Evidence not submitted to the ALJ is only reviewable by the District Court as a basis for a remand to the Commissioner for further proceedings pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Szubak*, 745 F. 2d at 833. To be relevant, new evidence "must relate to the time period for which benefits were denied and must not be solely of a later acquired disability, or of the subsequent deterioration of the previously nondisabling condition." *Id.*

Plaintiff does not provide any explanation for why the outcome with respect to her subsequent application was favorable, whereas the application giving rise to the instant appeal was not. In particular, she does not argue that specific new evidence was brought before the subsequent ALJ which necessitated the contrary ALJ judgment. The fact that Bruni's subsequent application was successful does not itself meet the new evidence standard articulated in *Szubak*. Hence, the Court sees no basis to remand pursuant to the sixth sentence of 42 U.S.C. § 405(g). Nor does the Court find that the subsequent award of disability benefits retroactively confirms that the record on which the ALJ made the decision under review was inadequately developed.

**2.      Whether the ALJ erred in finding Bruni's arthritis, sleep disturbances, and depression were non-severe impairments**

Bruni challenges the ALJ's findings that her osteoarthritis, sleep disturbances, and depression were non-severe impairments. The Court finds substantial evidence to support the ALJ's findings.

Plaintiff argues the osteoarthritis qualifies as a severe impairment based primarily on the opinion of Dr. Lifrak, Defendant's consulting physician. (D. I. 9 at 22) But Dr. Lifrak reached this opinion without having the benefit of Bruni's subsequent hearing testimony, in which Bruni

explained that her back pain was controlled by over-the-counter pain killers. Additionally, the report of the secondary consulting physician, Dr. Goldsmith, provided substantial evidence of the non-severity of Plaintiff's osteoarthritis. Furthermore, treating physician Dr. Magat signed Delaware Health and Social Services disability forms for Bruni in February and August 2008, neither of which included any mention of back pain. (Tr. 268, 270)

With respect to her sleep disturbances, Bruni contends that the ALJ erred in determining these were non-severe based solely on the lack of evidence demonstrating that Bruni underwent a sleep study. It appears that the ALJ did believe that a sleep study never occurred; and there is substantial evidence in the record to support the ALJ's conclusion on this point.[18] In addition, the ALJ also relied on the fact that treating physician Dr. Magat never listed sleep disturbances on any of the forms he completed, despite opining that Plaintiff was disabled. (Tr. 268, 270, 286)

Finally, Plaintiff challenges the ALJ's finding that her depression was non-severe, a finding the ALJ based on what she found to be a lack of impact on Bruni's life. *See* 20 C.F.R. § 404.12.05. The Court agrees with the Commissioner that the ALJ correctly applied the special review techniques provided for by the regulations (20 C.F.R. §404.920(a)), based on Dr. Brandon's psychiatric opinion. These special review techniques mandate that mental impairments be analyzed through broad functional areas.[19] By contrast, Dr. Magat is not a

---

[18]Not only is there no record of the sleep study occurring. There is also the fact that as late as October 2008, Dr. Magat's records contain affirmative representations that no sleep study had yet occurred and that one was scheduled for approximately December 2008. (Tr. 13, 274)

[19]As noted, those functional areas include: activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation. Section 416a(d)(1) explains: "If we rate the degree of your limitation in the first three functional areas as 'none' or

mental health specialist, so the ALJ was permitted to give greater weight to Dr. Brandon's

opinion. Dr. Magat also never made a referral to a mental health specialist. Further, the ALJ

relied upon Bruni's own testimony that she had not sought professional mental health treatment

since the late 1990's. (Tr. 42) This was consistent with Plaintiff's February 2008 pre-hearing

statement to the Commissioner that her depression did not prevent her from working.

### 3. Whether the ALJ failed to account adequately for the treating physician's opinion

Plaintiff argues that ALJ Showalter gave insufficient deference to the opinion of her

primary care physician, Dr. Magat. *See Mason v. Shalala*, 994 F. 2d 1058, 1067 (3d Cir. 1993).

Dr. Magat certified on multiple occasions that Plaintiff was disabled during the relevant period

and was unable to work, based on her Crohn's disease, COPD, depression, asthma, and arthritis.

(Tr. 268-70, 286) Generally, the Commissioner gives the most weight to the opinion of a

claimant's treating physician, since a treating physician has the most knowledge about the

individual patient's medical history. *See* SSR 96-2p, 1996 WL 374188, at *4.

The Commissioner responds that the ALJ was permitted to afford limited value to the

opinion of Dr. Magat as it was contained on mere "check the box" state disability forms, without

supporting explanation or documentation. *See Mason*, 994 F.2d at 1065 (stating two-page New

Jersey Division of Rehabilitation form, on which treating physician "check[s] boxes" and "fill[s]

in blanks," was "weak evidence at best"); *see also Coates v. Astrue*, __ F.Supp.2d__, 2009 WL

1514457 (W.D. Pa. May 29, 2009) (noting ALJ properly gave little weight to Pennsylvania

---

'mild', and 'none' in the fourth area, we will generally conclude that your impairment(s) is not
severe, unless the evidence indicates that there is more than a minimal limitation in your ability
to do basic work activities." 20 C.F.R. § 404.920(a).

24

Department of Public Welfare forms prepared by treating physician because forms were not accompanied by any explanation). Moreover, Dr. Magat's opinion was in conflict with the medical evidence of record. For example, Dr. Butt's gastrointestinal assessment explicitly classified Bruni's Crohn's disease as "clinically inactive." The Commissioner argues that an ALJ may "afford a treating physician's opinion more or less weight depending on the extent to which supporting explanations are provided." *Plummer*, 186 F. 3d at 422.

Here, the Court finds no error in the ALJ's approach. The ALJ adequately explained the amount of weight she gave to Dr. Magat's opinions and her basis for doing so. (Tr. 21) For the reasons already discussed earlier in this Opinion, the Court finds substantial evidence to support the ALJ's conclusion that only three of Bruni's impairments were "severe" and that one of these – Crohn's disease – was "clinically inactive" during the pertinent period. The ALJ was not required to defer to Dr. Magat's contrary (and largely unexplained) opinion.

### 4. Whether the ALJ failed properly to value and explain the weight given to the consulting physician

Plaintiff next argues that the ALJ erred by not giving due consideration to the medical opinion of Dr. Irwin Lifrak, the Commissioner's consulting physician. Dr. Lifrak opined that Bruni was capable of sitting for six hours a day, standing and walking for five hours in an eight hour work day, and lifting up to ten pounds with either hand. (Tr. 237) Bruni argues that this precise assessment is critical because it corresponds to an RFC of only sedentary work, *see* SSR 83-10, 1983 WL 31251, at * 5-6, which, once Bruni reached age 50 (in 2008), would render her disabled, *see* 20 C.F.R. § 404. The medical vocational rules specify that if the claimant is of qualifying age, lacks special skills and educational qualifications, and is unable to work above

25

the sedentary level, this significantly limits vocational adaptability. 20 C.F.R. § 404 ("Advanced age and a history of unskilled work or no work experience would ordinarily offset any vocational advantages that might accrue by reason of any remote past education, whether it is more or less than limited education."). In rejecting Dr. Lifrak's opinion, the ALJ concluded that Bruni was capable of doing more than sedentary work; in particular, the ALJ felt Bruni could engage in light work. Light work requires an employee to lift less than twenty (20) pounds at a time, with frequent lifting of objects weighing up to ten (10) pounds. A job in the light work category generally requires a good deal of walking or standing. *See* SSR 83-10, 1983 WL 31251, at \*5-6.

The ALJ concluded that Dr. Lifrak based his opinion primarily upon Bruni's arthritis. However, Dr. Lifrak did not have the benefit of Bruni's hearing testimony, at which she described her arthritis as controlled by over-the-counter pain medications. Moreover, the ALJ relied on the agency's secondary consulting physician, Dr. Goldsmith, who reviewed Bruni's medical records and concluded that her physical limitations left her able to perform light work. There is substantial evidence for the ALJ's decision to weigh Dr. Goldsmith's opinion more heavily than that of Dr. Lifrak.

> **5.     Whether the ALJ and vocational expert erred by not considering Bruni's Crohn's disease in analyzing her hypothetical work profile**

Bruni argues that the hypothetical put to the vocational expert was flawed because it failed to account for Bruni's Crohn's disease as one of her work limitations. Defendant responds, correctly, that not every alleged impairment need be included in a hypothetical to a VE, only those that are "credibly established limitations." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). There is substantial evidence to support the ALJ's conclusion that Plaintiff's Crohn's

26

disease did not, at the relevant period, require that Plaintiff have access to a bathroom with frequency inconsistent with an employment context. To the contrary, the record indicates that Plaintiff's Crohn's disease was "clinically inactive" (Tr. 275), "burned out" (Tr. 217), and "quiescent" (Tr. 219).[20] Accordingly, the ALJ's hypothetical was appropriate, as was the ALJ's reliance on the VE's response to it.[21]

## V.    CONCLUSION

For the forgoing reasons, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment. An appropriate Order follows.

---

[20]*See also* Tr. 19 (ALJ: "On January 14, 2008, Dr. Butt again examined the claimant (Exhibit 11F). The claimant reported that she had one or two formed bowel movements per day with abdominal pain. A colonoscopy demonstrated virtually no disease activity. She had been off her Crohn's disease medication for approximately one year without any subsequent change in her bowel habits. The claimant indicated that she would rather not take any medication for the condition. Dr. Butt noted that she had been poorly compliant with medication in the past and had missed three or more appointments since her previous visit. Dr. Butt concluded that the claimant's Crohn's disease was clinically inactive.").

[21]This conclusion is not altered by the fact that, at step 2 of the analysis, the ALJ concluded that Plaintiff's Crohn's disease was a "severe" impairment. At step 2, doubts as to whether an impairment is severe are to be resolved in favor of finding the impairment to be severe. *See McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360 (3d Cir. 2004) ("The burden placed on an applicant at step two is not an exacting one. . . . [A]n applicant need only demonstrate something beyond 'a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.' Any doubt as to whether this showing has been made is to be resolved in favor of the applicant.") (quoting SSR 85-28, 1985 WL 56856, at *3; other internal citations omitted).